Case: 2:23-cv-00199-GRB-ST

1

Greta Harman
Coastal Educational Services Group, LLC
T: 714-454-8570
greta.harman73@gmail.com
greta@coastaledgroup.com

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JAN 23 2023   ★

LONG ISLAND OFFICE

To: The Honorable Judge Gary R. Brown
United States District Court
Eastern District of New York

## DECLARATION OF GRETA HARMAN/COASTAL EDUCATIONAL SERVICES GROUP, LLC IN SUPPORT OF DEFENDANT
### ORDER TO SHOW CAUSE- Defendant Response

I, GRETA HARMAN, Sole Proprieter, Coastal Educational Services Group, LLC hereby declare under the penalties of perjury that the following is true and correct:

1. I am a named defendant in the above captioned matter. I make this Declaration based upon my own personal knowledge AND the factual evidence (included) of the facts and circumstances surrounding this matter.
2. I submit this Declaration as a response to PLAINTIFF's Order to Show Cause for a temporary restraining order and preliminary injunction.
3. I am currently unemployed and have been unemployed since January 1, 2021. I am unable to retain legal representation as a result and submit this on my own behalf.
4. I have been an educational therapist and small business owner for 11 years. At the time of meeting the PLAINTIFF I was working full time as an educational therapist. I was working with children and families experiencing challenges in school and at home. As a small business owner I was grossing approximately $15,000 month.
5. In line (6) of PLAINTIFF'S declaration she claims I met her in or around 2017 at a book signing. **FACTS:** I originally met PLAINTIFF at her book signing on June 12, 2016 in Irvine, CA. (Exhibit A)
6. I, DEFENDANT, began initial employment negotiations with PLAINTIFF on November 27, 2017 under the umbrella of my LLC Corporation. (Exhibit B)
7. In an email from me, DEFENDANT, to PLAINTIFF addressed on November 27, 2017 I mention for the first time the benefit of using my TEACHABLE platform.
8. PLAINTIFF claims in line (7) that I, DEFENDANT 'offered to set up an account for PLAINTIFF on www.teachable.com (herinafter "Teachable) and then says in line (8), "As instructed, DEFENDANT set up an account for PLAINTIFF on Teachable called The Conscious Classroom." However, the Teachable platform was purchased by my LLC, Coastal Educational Services Group, LLC on November 9, 2017, three weeks PRIOR to my company's initial employment negotiations with PLAINTIFF. (Exhibit D)

9.  The initial Teachable online classroom was named "The-Solution-Tree.teachable.com" and was named such because I had intended to use the platform for my Educational Therapy services offered through my LLC, Coastal Educational Services Group, LLC.

10. PLAINTIFF claims in line (9) that 'none of the content has ever belonged to Defendant'; **Fact:** I often created content for PLAINTIFF from content I had previously created for my Educational Therapy business and I removed my branding/logo and added hers to my content.

11. On December 7, 2017, I, DEFENDANT, exchanged emails with PLAINTIFF regarding the terms of our initial 90 day business/employment contract which stated an upfront retainer fee of $8,500 per month and included an invoice from my LLC, Coastal Educational Services Group, LLC in the amount of $8,500. (Exhibit E)

12. On December 8, 2017, PLAINTIFF sent an email stating " I want to look at this as a 3-month trial because it will be a good period of time to assess all the changes and improvements by then. At this point, I know I can definitely commit to $5000/month. Let me sit with the rest of it and get back to you. I will send you the $5000 at least and we can discuss the rest tomorrow." (Exhibit F)

13. I, DEFENDANT, was eager to work with PLAINTIFF and so I accepted her initial verbal offer, and we began our working relationship WITHOUT a signed business contract.

14. The work I did for PLAINTIFF quickly escalated into exponentially more that the 145-160hrs per month that I quoted in my proposal (Exhibit F) and as the months and years went on I would often work upwards of 280-300hrs per month WITHOUT additional compensation from PLAINTIFF. In addition, I lost all of my educational therapy clients as I had no available time to continue seeing clients as my work with PLAINTIFF was all consuming.

15. On or about December 31, 2018, I, DEFENDANT, emailed PLAINTIFF a letter stating that I could no longer work under the conditions I had been working and I asked for 10% commission on all sales going forward. I stated that if PLAINTIFF did not agree to the suggested increase in compensation that I, DEFENDANT, would be forced to resign as the working conditions and terms were not sustainable considering I was working 280-300hrs per month and being compensated a rate that was not even standard living wages. I received an email response from PLAINTIFF suggesting I was a quitter and just replicating a pattern from my childhood. PLAINTIFF called me a procrastinator and lazy and said she would not allow me to quit and that the business we were building together was only going to get bigger and better for us both. PLAINTIFF intentionally used confidential and sensitive information she knew about me (in a therapist/patient capacity) as a weapon to influence my decisions. As a result, I, DEFENDANT, agreed to continue working with PLAINTIFF without any further compensation.

16. On January 5, 2021 I admitted to PLAINTIFF Coastal Educational Services Group, LLC had been compensating itself via the Teachable platform that it owned and had paid for since its inception on November 8, 2017 an amount considerably less than the  10% of gross sales I had requested.

17. As a result, PLAINTIFF sought to to humiliate, vilify, emotionally maniputlate both me (DEFENDANT) and my then husband in an attempt to recover whatever monies she could. The humiliation began with a PSA on her social media platforms and via email

that she was no longer professionally or personally associated with me and she would not recommend me. (Exhibit G)

18. The attempt to humiliate, vilify and emotionally manipulate me and my then husband, continued through a five-day long text/email/phone assault by PLAINTIFF which included messages suggesting I was lying to my then husband, was possibly leading a double life, had an irreparable personality disorder and would never be cured. This defaming information was also shared via several video webinars PLAINTIFF hosted for her online communities, which have hundreds if not thousands of members who knew me, my husband and my children as we were often the subject of PLAINTIFF'S case studies for her online courses, including Luminous and the Conscious Coaching Institute. (Exhibit H).

19. If anyone should be suing anyone for defamation it should be me, DEFENDANT, suing PLAINTIFF as documented by extensive videos, texts, emails of PLAINTIFF to and about me. All documentation, including videos, will be provided upon your request and instruction.

20. The content I posted on my social media platforms, both TikTok and Instagram, was in response to her psychological manipulation, abuse, gaslighting and bullying that I, and my family suffered at the hands of PLAINTIFF. The content of said social media posts was factual and was part of my recovery from the trauma I had endured at the hands of a Ph.D. clinical psychologist who has an ethical and moral responsibility to 'do no harm'.

21. On January 5, 2021, PLAINTIFF, after receiving a phone call from my husband stating I was suicidal and he was concerned for my mental health, sent a text message stating, "You need to tell her that if she wants a chance with (you) Clint he needs to get the money and pay. Do not threaten to leave her right now You are the only one who can get her to stay alive an pay me." (Exhibit H)

22. PLAINTIFF used her influence and substantial platform to share her truth in January of 2021 and it has taken me, DEFENDANT, two years to recover from her abuse and what I now know to be Stockholm syndrome. I have been unable to get work as a result of PLAINTIFF spreading confidential personal information about me and as a result, my marriage has ended and I have lost everything. I have spent the past two years healing from the abuse which included dual relationship, psychological and emotional manipulation and gaslighting. My posts were simply a way for me to share my truth just as she shared her truth. Please note, my social media platforms are miniscule (Instagram - 1,646 followers and TikTok- 23,000 followers) in comparison to PLAINTIFF'S social media platforms (Instagram- 930,000 followers and TikTok- 60,800 followers).

23. The relationship between me and PLAINTIFF was dual in nature as PLAINTIFF acted as both employer AND therapist and this dual relationship was then used against me, under extreme duress, which led to a false confession which was obtained, recorded and shared with third partires at my expense. This was a business dispute, LLC to LLC, that was turned into a very personal assault by PLAINTIFF with the sole intent to humiliate, vilify, and emotionally manipulate me, DEFENDANT, into turning over ownership of the Teachable platform, which my, LLC rightfully owned and paid for, as well as verbally confess to 'theft' which happened under extreme duress and exhaustion.

24. Dual relationship existed between PLAINTIFF and me and according to the APA, the sole responsibility of PLAINTIFF is to identify and rectify so as to protect the best interests of the affected person. According to the APA in attached (Exhibit I), "The fourth paragraph in Standard 3.05 addresses potentially harmful, unanticipated multiple relationships:

(b) If a psychologist finds that, due to unforeseen factors, a potentially harmful multiple relationship has arisen, the psychologist takes reasonable steps to resolve it with due regard for the best interests of the affected person and maximal compliance with the Ethics Code.

Note that the touchstone is again what a reasonable psychologist would do. The psychologist's focus will be on the affected person's best interests and on complying with the Ethics Code, which has as its focus the individual's welfare and protection. Thus, the Ethics Code continues to return to and emphasize its central values of doing good and not doing harm, found in Principle A of the code's General Principles, Beneficence and Nonmaleficence." (Exhibit I)

**Conclusion:**

I have been defamed, marginalized, threatened and abused by a clinical psychologist who became too entangled in my life. I've lost my clientele, my business, my marriage and my cherished reputation thanks to PLAINTIFF'S unethical behavior. Because there is clear evidence of the PLAINTIFF'S wanton negligence, I demand the return of the $130,000 I returned to her under duress as well as $1,000,000 in punitive damages.

Respectfully submitted,

*Greta Harman*
Greta Harman

CASE 2:23-cv-00199-GRB-ST                    Exhibit A





**From: Dr. Shefali** drshefali@globalid.com 
**Subject:** Re: Follow-Up
**Date:** November 27, 2017 at 3:31 PM

**To:** Greta Harman greta@coastaledgroup.com



Will call you by tonight

Love 🧡

On Nov 27, 2017, at 6:07 PM, Greta Harman <greta@coastaledgroup.com> wrote:

Hi Dr. Shefali,

Per our conversation this morning, this is what I have come up with. You asked for modest $ and this proposal, I feel, is modest and fair in terms of $ and time (this job is really MORE than 40hrs per week and necessitates being accessible on demand). Let me know your thoughts.

**Terms:**
    Employment term is on consultant basis for an initial 90 days with renegotiation option after 90 days.
    Advanced retainer fee of $8,500 per month. Billable hourly rate is $60hr.
    Based on scope of work outlined below, estimated hours per month for initial 90 days is approx 145-160 hours (modest estimation)
    Unused hours, if any, will roll over to following month.

**Scope of work for initial 90 days is as follows:**
    FOCUS IS ON YEAR OF MANIFESTATION
    Develop and implement marketing strategy for YOM course- Current enrollment approx 100, Goal= 500+
    12 day countdown to YOM campaign
    Develop and implement affiliate marketing for YOM
    Develop and implement marketing for YOM for after 1st of the year
    Integrate click funnels and mail chimp into teachable e-course platform to allow better content management as well as increase revenue opportunities from online courses (migration of existing older courses to teachable platform)
    Manage and oversee Bill and the website/copy rebranding
    Curate and organize existing content - including all content on Vimeo
    Organize Evolve content and begin outlining Evolve 2018
    Refresh press kit to include top 3 impactful videos, organize and refresh content to showcase media and publication appearances, create beautiful one page bio with new branding and copy
    Work on sizzle reels in existing content
    Maintain social media engagement including curating 1min videos from existing content
    Begin merchandising project in January, beginning with deck of quotes.
    Assist in contract reviews, email correspondence, any/all administrative tasks as deemed necessary.

I connected with Bill a little while ago and he was working diligently to get you his scope of work and budget within the next hour or so. I will follow up with him by 4pm PST if I don't see his proposal before then.

Let me know you thoughts.


XOXO,
Greta




Greta Harman M.Ed. BCET

Office: 714-662-5772
Cell: 714-454-8570
coastaledgroup.com



**From: Greta Harman** greta@coastaledgroup.com
**Subject:** Re: Things
**Date:** November 27, 2017 at 7:59 AM
**To:** Shefali Tsabary drshefali@globalid.com
**Bcc:** tammy@bcramsay.com

See my responses below. Can we chat after I get my kids off to school? I'm free anytime after 8:30am PST.

On Nov 27, 2017, at 4:15 AM, Dr. Shefali <drshefali@globalid.com> wrote:

1) amazing list of strategies!!!! Amazing. Thank you. I leave Tomo. Once I return I am fully committed. See? I already talk like you are my boss:) Great. ' Boss' sounds superior to so I prefer 'COO' :) I will be your chief of operations (COO), your strategist, and your manager. I will keep my finger on the pulse of what's going on in the world, how it's relevant to your audience and to your business and I will ALWAYS tell you the truth, even if it's not what you want to hear. I will be the point of entry for access to you (think no more Goldie situations). I will be the intermediary for all things strategic, administrative and operational so your focus can be developing more courses, attending more speaking engagements, authoring more books, designing more courses, developing your tv show, magazine, merchandise… sky is the limit. I will strive to embody the same level of compassion and oneness consciousness and I will uphold the importance of your audience, your network and connections, and all of humanity. As a result, you will trust me to make decisions organically and in the moment that are unquestionably in alignment with your vision and values. Oprah has Gayle, you have Greta :)

2) I need a plan for video downloads on my courses. What do others do?? Do they allow indefinite access to the members area? I don't like this. I prefer to give people abilit to download for few months (how many??) after course ends and call it a day! In the world of e-courses, there isn't a one-size-fits all approach to this issue. For YAH, I would give access to course content until February 1. I would also make instructions available for how to download the content (for the less tech-savvy). I think someone already stepped up and authored instructions. How will you restrict access to those that completed the course but leave intact access to those who just signed up? Is that just a simple PW change? (We should also discuss the impact of late registrations for YAH and how that impacts sales for YOM) What platform does the course reside on currently (what is the workflow process from live webinar to members only area?) and is there a way to automate access if the parameters are set to 30 days of access after 1 year? Going forward for future courses (maybe not YOM if you already have quite a few sales), I suggest offering courses with several tiers of access 15months, 18months, etc. priced accordingly and you do not have to include a lifetime options; however, it DOES boost sales quite a bit. People LOVE the idea of lifetime access and are definitely more likely to purchase a course if they know there is no expiration. We can discuss.

Lmk thoughts.
Carrie-Ann Moss has a wonderful teachable course site…
http://annapurnaliving.com/courses - she is one of the top sellers on the teachable platform and has made more than 2mil on her courses!! She does not offer lifetime access and offers more of a subscription-based, monthly access but also offers shorter courses with fixed access limits.

The #1 selling course built on teachable platform is 52Kards- a card magic e-course. The author/teacher, Asad Chaudhry, has made over 15mil on his e-courses… for card magic tricks! He does offer lifetime access btw.
https://courses.52kards.com/p/the-foundations-of-card magic?src=teachable-examples

Am here today to talk.

Class tonight.

**From: Teachable** receipts+CUGEIzlHsQQULUIq3F9W@stripe.com
**Subject:** Your Teachable receipt [#2832-4936]
**Date:** November 9, 2017 at 11:57 AM
**To:** greta@coastaledgroup.com



$99     Teachable                        $99 Teachable at

VISA 0583 0583

November 9, 2017  November 9, 2017  #2832-4936  #2832-4936  Description

Amount

Subscription to Professional - $99 $99.00  Total  $99.00

Paid  **$99.00**

Have a question or need help? Visit our support site or send us
an email.

Something wrong with the email? View it in your browser.
You are receiving this email because you made a purchase at Teachable

**From: Greta Harman**
greta@coastaledgroup.com
**Subject:** Re: Invoice from Coastal Educational Services Group (0005)
**Date:** December 7, 2017 at 6:59 AM
**To:** Shefali Tsabary drshefali@globalid.com



Oh no, I think there may have been a misunderstanding. In my email quote before your cruise (and our discussion via phone) the MONTHLY fee was $8500 and was structured as an upfront retainer which was structured as access retainer rather than billable hours- essentially rather than track hours and billing hourly rate of $60hr- I proposed a flat rate NOT TO EXCEED $8500mo as I prospected an average of 145-160hrs worked PER MONTH. (145 x 60 = $8700) (160 x 60 = $9600) Plus I was giving you $1200 teachable platform.

I'm so sorry about the misunderstanding. Let me know your thoughts. Absolutely no love is lost if this doesn't work out. XOXO

**Terms:**

- Employment term is on consultant basis for an initial 90 days with renegotiation option after 90 days.
- Advanced retainer fee of **$8,500** per month. Billable hourly rate is $60hr.
- Based on scope of work outlined below, estimated **hours per month** for initial 90 days is approx 145-160 hours (modest estimation)
- Unused hours, if any, will roll over to following month. No additional hours will be billed.

**Scope of work for initial 90 days is as follows:**

- FOCUS IS ON YEAR OF MANIFESTATION
- Develop and implement marketing strategy for YOM course- Current enrollment approx 100, Goal= 500+
- 12 day countdown to YOM campaign
- Develop and implement affiliate marketing for YOM
- Develop and implement marketing for YOM for after 1st of the year
- Integrate click funnels and mail chimp into teachable e-course platform to allow better content management as well as increase revenue opportunities from online courses (migration of existing older courses to teachable platform)
- Manage and oversee Bill and the website/copy rebranding

- Develop parent/teen marketing materials and strategy for all 5 planned events for 2018

- Curate and organize existing content - including all content on Vimeo
- Organize Evolve content and begin outlining Evolve 2018
- Refresh press kit to include top 3 impactful videos, organize and refresh content to showcase media and publication appearances, create beautiful one page bio with new branding and copy
- Work on sizzle reels in existing content
- Maintain social media engagement including curating 1min videos from existing content
- Begin merchandising project in January, beginning with deck of quotes.
- Assist in contract reviews, email correspondence, any/all administrative tasks as deemed necessary (includes overseeing Kris and the billable hours she submits).

On Dec 7, 2017, at 3:56 AM, Dr. Shefali <drshefali@globalid.com> wrote:

Hi there!
Are we splitting this into 3 payments over 90 days or all at once? Lmk. Thanks.
Maybe I am misunderstanding.
Open to getting clarity.
Shefali

Begin forwarded message:

**From:** Coastal Educational Services Group <service@paypal.com>
**Date:** December 7, 2017 at 1:26:50 AM EST
**To:** "Dr. Shefali Tsabary" <drshefali@globalid.com>
**Subject: Invoice from Coastal Educational Services Group (0005)**

**Reply-To:** Coastal Educational Services Group <greta@coastaledgroup.com>

Hello, Shefali Tsabary



# Here's your invoice

Coastal Educational Services Group sent you an invoice
for $8,500.00 USD

Due on receipt

## Get more time to pay

Simply select PayPal Credit at checkout and enjoy 6 months to
pay. Subject to credit approval. See terms. US customers only.



Help & Contact | Security | Apps



PayPal is committed to preventing fraudulent emails. Emails from PayPal will always contain your full name. Learn to identify phishing

Please do not reply to this email. To get in touch with us, click **Help & Contact**

Copyright © 1999-2017 PayPal, Inc. All rights reserved. PayPal is located at 2211 N. First St., San Jose, CA 95131.

PayPal PPC000977:6739fbd6b2859

**From:** Dr. Shefali drshefali@globalid.com 🚩
**Subject:** lol - this was sitting in my lap top - sorry - I thought you received it - but it was just sitting here!!!!
**Date:** December 8, 2017 at 7:38 AM
**To:** Greta Harman greta@coastaledgroup.com

Hi Love,

Sorry for the misunderstanding.

Let me work my numbers - given my current possible transition in my marriage - and see what makes sense for me at this critical juncture.

I want to look at this as a 3-month trial because it will be a good period of time to assess all the changes and improvements by

then. At this point, I know I can definitely commit to $5000/month.

Let me sit with the rest of it and get back to you.

I will send you the $5000 at least and we can discuss the rest tomorrow.


On Dec 7, 2017, at 9:59 AM, Greta Harman <greta@coastaledgroup.com> wrote:

Oh no, I think there may have been a misunderstanding. In my email quote before your cruise (and our discussion via phone) the MONTHLY fee was $8500 and was structured as an upfront retainer which was structured as access retainer rather than billable hours- essentially rather than track hours and billing hourly rate of $60hr- I proposed a flat rate NOT TO EXCEED $8500mo as I prospected an average of 145-160hrs worked PER MONTH. (145 x $60 = $8700) (160 x $60 = $9600) Plus I was giving you $1200 teachable platform.

I'm so sorry about the misunderstanding. Let me know your thoughts. Absolutely no love is lost if this doesn't work out.

XOXO <Screen Shot 2017-12-07 at 6.48.09 AM.png>


On Dec 7, 2017, at 3:56 AM, Dr. Shefali <drshefali@globalid.com> wrote:

Hi there!
Are we splitting this into 3 payments over 90 days or all at once? Lmk. Thanks.
Maybe I am misunderstanding.
Open to getting clarity.
Shefali


Begin forwarded message:

**From:** Coastal Educational Services Group <service@paypal.com>
**Date:** December 7, 2017 at 1:26:50 AM EST
**To:** "Dr. Shefali Tsabary" <drshefali@globalid.com>
**Subject: Invoice from Coastal Educational Services Group (0005)**
**Reply-To:** Coastal Educational Services Group <greta@coastaledgroup.com>

Hello, Shefali Tsabary



# Here's your invoice

Coastal Educational Services Group sent you an invoice for $8,500.00 USD

Due on receipt

## Get more time to pay

Simply select PayPal Credit at checkout and enjoy 6 months to pay. Subject to credit approval. See terms. US customers only.





Help & Contact | Security | Apps

PayPal is committed to preventing fraudulent emails. Emails from PayPal will always contain your full name. Learn to identify phishing

Please do not reply to this email. To get in touch with us, click **Help & Contact**

Copyright © 1999-2017 PayPal, Inc. All rights reserved. PayPal is located at 2211 N. First St., San Jose, CA 95131.

PayPal PPC000977:6739fbd6b2859

From: **olivia olano** oliviacolano@gmail.com 🔶
Subject: Fwd: IMPORTANT NOTICE TO MY COMMUNITY
Date: January 11, 2021 at 11:55 AM
To: mother dearest greta.harman73@gmail.com



Sent from my iPhone

Begin forwarded message:

**From:** "Team Dr. Shefali" <team@drshefali.com>
**Date:** January 11, 2021 at 10:37:00 AM PST
**To:** Olivia <oliviacolano@gmail.com>
**Subject: IMPORTANT NOTICE TO MY COMMUNITY**
**Reply-To:** "Team Dr. Shefali" <team@drshefali.com>

Dear Olivia,

This notice is to inform you that my admin assistant, **Greta Trickovic Harman NO LONGER WORKS FOR ME**.

I am no longer personally nor professionally associated with her and withdraw all recommendations about her.

Please write to: team@drshefali.com if you have any lingering issues that she might have been handling for you.

Also, please bear with us as we go through our transition and understand if we take longer than usual to return to you.

Thank you for understanding our current situation and trusting that we will resolve this and elevate to the highest new place of possibility ever.

Warmly,

*Shefali*

Copyright © 2021 Global Inner Disarmament, All rights reserved.

You are receiving communication because you have subscribed to areas of Dr. Shefali's website, purchased courses or products from her or have utilized or may be utilizing her

services. You can <u>update your preferences</u> or <u>unsubscribe from this list</u>.



Texts between Shefali Tsabary & Clint Harman

Tues. Jan 5, 2021

Case 2:23-cv-00199-GRB-ST   Document 10   Filed 01/23/23   Page 19 of 22 PageID #: 224

### ⊕ AMERICAN PSYCHOLOGICAL ASSOCIATION

MEMBERS          TOPICS          PUBLICATIONS & DATABASES          SCIENCE          EDUCATION & CAREER          NEWS & ADVOCACY

ⓘ This page has been archived and is no longer being updated regularly.

ETHICS ROUNDS

# Multiple relationships and APA's new Ethics Code: Values and applications



ethics rounds

January 2004, Vol 35, No. 1
Print version: page 66
6 min read

❝ (javascript:toggleCitation();)

(javascript:toggleFeedback();)

f (#)

🐦 (javascript: openSocialShare('https://twitter.com/share?url=https%3a%2f%2fwww.apa.org%2fmonitor%2fjan04%2fethics&via=APA&text=Ethics+rounds--Multiple+relationships+and+APA%2527s+new+Ethics+Code%3a+Values+and+app

in (javascript: openSocialShare('https://www.linkedin.com/shareArticle?mini=true&url=https%3a%2f%2fwww.apa.org%2fmonitor%2fjan04%2fethics&title=Ethics+rounds--
Multiple+relationships+and+APA%2527s+new+Ethics+Code%3a+Values+and+applications&summary=A+multiple+relationship+arises+when+a+psychologist+is+in+a+professional+role+with+an+individual%2c+and+one+of+three+other+cond

✉ (javascript:openEmail('English');)

🖨 (javascript:printThis();)

**BY DR. STEPHEN BEHNKE APA Ethics Director**

According to its preamble, the new APA Ethics Code "has as its goals the welfare and protection of the individuals and groups with whom psychologists work and the education of members, students and the public regarding ethical standards of the discipline." Standard 3.05, on multiple relationships, is an excellent example of how the code achieves these goals. To illustrate how it both protects and educates, Standard 3.05 can be broken down into five parts.

The first paragraph of the standard offers a definition that is new to the code. The definition states that a multiple relationship arises when a psychologist is in a professional role with an individual, and that, in addition to this professional role, one of three other conditions is met. Note the future aspect to the third condition--that the psychologist indicates that another relationship will occur at some later point in time.

STANDARD 3.05 MULTIPLE RELATIONSHIPS

(a) A multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person, (2) at the same time is in a relationship with a person closely associated with or related to the person with whom the psychologist has the professional relationship, or (3) promises to enter into another relationship in the future with the person or a person closely associated with or related to the person.

The first paragraph of Standard 3.05 thus informs psychologists and the public what constitutes a multiple relationship.

Case 2:23-cv-00199-GRB-ST   Document 10   Filed 01/23/23   Page 20 of 22 PageID #: 225

One of the most frequent misconceptions I encounter in consulting with psychologists is that multiple relationships are, by definition, unethical. The second paragraph of Standard 3.05 makes it clear that simply meeting the definition does not speak to the ethics of the multiple relationship. In order to assess the ethical appropriateness of the relationship, the second paragraph sets forth a test:

A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists.

Note several things about this test. First, the test sets out criteria: *an impairment* in objectivity, competence or effectiveness, and *a risk* of exploitation or harm. In assessing whether the test is met, the psychologist will therefore consider the likelihood of impairment or the risk of exploitation or harm. Second, the phrase "reasonably expected" is central in determining what level of likelihood must be present: what a reasonable psychologist would expect to occur. Would a reasonable psychologist expect that the multiple relationship will cause impairment or risks exploitation or harm? If a reasonable psychologist would not, the test is not met.

Third, there must be a causal connection between the multiple relationship and the impairment or risk. In other words, something about the relationship must reasonably lead a psychologist to expect that the relationship will cause impairment or risks exploitation or harm. Thus, that a multiple relationship exists, in and of itself, does not meet the test--a reasonable psychologist must expect that the multiple relationship will lead somewhere problematic. The third paragraph in Standard 3.05 emphasizes this point:

Multiple relationships that would not reasonably be expected to cause impairment or risk exploitation or harm are not unethical.

The definition in Standard 3.05 educates psychologists and the public about when a multiple relationship is present. The test that follows protects those with whom psychologists work, and thereby promotes their welfare, by making a safe space available for the psychologist and client to proceed.

One of the very enjoyable aspects of my position directing the APA Ethics Office is that I have the opportunity to listen to psychologists discuss ethical aspects of their work. Discussions about Standard 3.05 are especially interesting because of the wide variety of multiple relationships that arise in our profession. Often, though, I find myself thinking that a discussion ostensibly about the ethics of multiple relationships is not really about ethics at all.

What I mean is that often such discussions pose a specific question: whether a multiple relationship will lead to impairment or risks exploitation or harm. All the participants agree that if the multiple relationship were likely to lead to impairment or such risks, the relationship should be avoided. Thus, the debate is not about values--protecting from harm and promoting welfare--but is rather about what effect a particular multiple relationship will have on a particular client. While the answer to this clinical question has profound ethical implications, the disagreement remains on clinical and technical grounds. As psychologists, we can agree upon and share the underlying values.

The APA Ethics Code recognizes that because of the many roles psychologists assume in their work, family, community and social lives, multiple relationships arise in unexpected ways. Some of these multiple relationships are potentially harmful. The fourth paragraph in Standard 3.05 addresses potentially harmful, unanticipated multiple relationships:

(b) If a psychologist finds that, due to unforeseen factors, a potentially harmful multiple relationship has arisen, the psychologist takes reasonable steps to resolve it with due regard for the best interests of the affected person and maximal compliance with the Ethics Code.

Note that the touchstone is again what a reasonable psychologist would do. The psychologist's focus will be on the affected person's best interests and on complying with the Ethics Code, which has as its focus the individual's welfare and protection. Thus,

the Ethics Code continues to return to and emphasize its central values of doing good and not doing harm, found in Principle A of the code's General Principles, Beneficence and Nonmaleficence.

In its fifth and final paragraph, Standard 3.05 recognizes that psychologists are sometimes required to serve in more than one role in judicial or administrative proceedings, and so cannot always avoid or fully resolve a potentially harmful multiple relationship. When a psychologist encounters such a situation, the Ethics Code focuses the psychologist on informing those affected about the change in expectations. The reasoning behind the code's language is that if a psychologist must take on a potentially harmful multiple role, the best way to help protect those affected is to inform them of the change in circumstances:

(c) When psychologists are required by law, institutional policy, or extraordinary circumstances to serve in more than one role in judicial or administrative proceedings, at the outset they clarify role expectations and the extent of confidentiality and thereafter as changes occur. (See also Standards 3.04, Avoiding Harm, and 3.07, Third-Party Requests for Services.)

Thus, Standard 3.05:

* Defines a multiple relationship.

* Provides a test for when psychologists refrain from entering into a multiple relationship.

* Indicates what psychologists do when an unanticipated and/or unavoidable multiple relationship arises in their professional lives.

The goal of Standard 3.05, like the goal of the code as a whole, set forth in the preamble, is "the welfare and protection of the individuals and groups with whom psychologists work and the education of members, students and the public regarding ethical standards of the discipline."

Standard 3.05 illustrates that an excellent way to protect our clients and promote their welfare is to educate the public about our profession's core values and to inform psychologists about how these values can be implemented in their everyday practice.

*For the full text of APA's Ethics Code, visit the* Ethics page (/ethics) .

*Please send questions or comments about this column or suggestions for future "Ethics Rounds" columns via* e-mail. (mailto:ethicsrounds@apa.org)

---

The content I just read: 👍 IS HELPFUL 👎 IS NOT HELPFUL

---

❝
(javascript:toggleCitation();)

f
(#)

🐦 (javascript: openSocialShare('https://twitter.com/share?
url=https%3a%2f%2fwww.apa.org%2fmonitor%2fjan04%2fethics&via=APA&text=Ethics+rounds-
-Multiple+relationships+and+APA%2527s+new+Ethics+Code%3a+Values+and+applications'))

in (javascript: openSocialShare('h
Multiple+relationships+and+APA%

Letters to the Editor

Send us a letter



Case 2:23-cv-00199-GRB-ST   Document 10   Filed 01/23/23   Page 22 of 22 PageID #: 227

# Advancing psychology to benefit society and improve lives



| PSYCHOLOGISTS | STUDENTS | PUBLICATIONS & DATABASES | ABOUT APA |
|---|---|---|---|
| Standards and Guidelines | Careers in Psychology | APA Style | Governance |
| PsycCareers | Accredited Psychology Programs | Journals | Directorates and Programs |
| Divisions of APA | More for Students | Books | Press Room |
| Ethics | | Magination Press | Advertise with Us |
| Early Career Psychologists | **ABOUT PSYCHOLOGY** | Videos | Corporate Supporters |
| Continuing Education | Science of Psychology | APA PsycInfo | Work at APA |
| Renew Membership | Psychology Topics | APA PsycArticles | Contact Us |
| | | More Publications & Databases | |

**MORE APA WEBSITES**

ACT Raising Safe Kids Program          APA Merch Store

American Psychological Foundation    APA PsycNet®

APA Annual Convention                     APA Style®

APA Services, Inc.                             Online Psychology Laboratory

**GET INVOLVED**

Advocate          Participate          Donate          Join APA

Privacy Statement   Terms of Use   Accessibility   Website Feedback   Sitemap      **FOLLOW APA**         more

© **2023 American Psychological Association**
750 First St. NE, Washington, DC 20002-4242  |  Contact Support
Telephone: (800) 374-2721; (202) 336-5500 | TDD/TTY: (202) 336-6123

